# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MAINE

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF THE PERSON OF PATRICK MCKINNON (DOB 01/12/1990) | No. 2:24-mj-123-KFW |

**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT**

I, Jonathan Duquette, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I am a Task Force Officer (TFO) with the Federal Bureau of Investigation (FBI). I have been in this position since June 2015, and I have been a Task Force Officer in FBI's Boston Division since January 2018. I am also a Border Patrol Agent with the U.S. Border Patrol and have been in this position since December 2009. In my career, I have utilized various investigative tools and techniques, to include the use of search warrants.

2. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant to search the person of PATRICK MCKINNON (DOB 01/12/1990). The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other law enforcement officers, other agents, and witnesses. This affidavit is intended to provide the facts necessary for a determination of probable cause for the requested search warrant.

3. Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that a violation of 21 U.S.C. § 841(a)(1) (Distribution or Possession with Intent to Distribute Controlled Substances) & 846 (Attempt and Conspiracy) have been committed by PATRICK MCKINNON, DOB

01/12/1990. There is also probable cause to search the person described in Attachment A for evidence and instrumentalities of this crime as described in Attachment B.

### PERSON TO BE SEARCHED

As described in Attachment A, this application is for a warrant to search the person of PATRICK MCKINNON ("MCKINNON"), DOB 01/12/1990. From his Maine driver's license information, MCKINNON is described as a Caucasian male, weighing 196 pounds, 6'01" tall, with brown hair and brown eyes. From my investigation, which includes reviewing known photographs of MCKINNON, I am familiar with his appearance and will accompany officers during the execution of said warrant. A copy of his photograph on file with the Maine Bureau of Motor Vehicles appears below:



### PROBABLE CAUSE

4. For reference, a previous search warrant affidavit has been filed in the United States District Court, District of Maine Case No. 2:24-mj-102-KFW and is attached as Exhibit B. That warrant authorized the search of two Apple iPhones and one TCL cellphone seized from JUSTIN NEVES' girlfriend's apartment in Old Orchard

Beach, Maine. Exhibit B incorporates Exhibit A, a previous search warrant affidavit filed in the United States District Court, District of Maine Case No. 2:24-mj-67-KFW, which authorized the search of three Apple iPhones, two were recovered from a Honda HR-V and one from JOSHUA ESTRADA ("ESTRADA"). Exhibit A incorporates Exhibit 1, a previous search warrant affidavit filed in the United States District Court, District of Maine Case No. 2:24-mj-54-KFW, which outlines the identification of ESTRADA, YANCARLOS ABRANTE ("ABRANTE"), and JASON JOHNSON-RIVERA ("JOHNSON-RIVERA") as subjects of an investigation.

5. Target Device 1 from Exhibit A was determined to be utilized by JOHNSON-RIVERA (with assigned call number 508-863-7847). Target Device 2 from Exhibit A was determined to be utilized by ABRANTE (with assigned call number 508-972-3282). While reviewing Target Device 1, I located a video that had been uploaded to Snapchat on February 1, 2024, from Snapchat account Jayouda_912, which belonged to JOHNSON-RIVERA[1]. The video captured a Caucasian male wearing jeans, a white tee shirt, black puffy jacket and red hat. The video showed the man holding a spoon that appeared to contain a controlled substance in one hand and a handgun in the other. A second handgun was in the man's waistband. A screen shot of the video is shown below:

---

[1] Subscriber records obtained from Snapchat on user, Jayouda_912, identified the verified phone number for the account was 508-863-7847, a known number for JOHNSON-RIVERA.

3



6.  I showed the video to Saco Detective and FBI Task Force Officer Ryan Hatch who believed the man captured in the video holding the spoon was MCKINNON.

7.  Target Device A from Exhibit B was determined to be utilized by JUSTIN NEVES a/k/a "Savage" and was assigned call number 774-636-0214 (0214). While reviewing Target Device A, I located a Facebook Messenger conversation between Facebook user "Patrick McKinnon" (Unique ID 100000811666870) and Facebook user "Bos Sav" (Unique ID 100055865648492). Facebook user "Bos Sav" was identified as the "owner" in Target Device A.

8.  On March 17, 2024, at 5:35:23 PM (UTC), Patrick McKinnon sent the following message to Bos Sav:

> From: 100000811666870 Patrick McKinnon
>
> Tressy just fucked my whole spot up for work. I should've never involved bringing him here to make money. Now my motion is all fucked up and I have no work at all and people calling and shit. I have the customers no problem just need work on deck. Whether I work my way up from a basket or partner up with someone. This has everything fucked up cuZ I don't even have anyone else to get work from like I need . I need either someone to chill here or at least work with me  a little bit while shit gets rolling again. Our regular guy is gone and we're loosing money fast
>
> 3/17/2024 5:35:23 PM(UTC+0)

Source Extraction: Legacy

9. I know from my training and experience that the term "work" is likely a reference to drug sales. Based on MCKINNON's statement that, "Our regular guy is gone and we're loosing [sic] money fast" leads me to believe NEVES and MCKINNON were somehow connected in drug sales.

10. On March 17, 2024, at 10:53:41 PM (UTC), Patrick McKinnon sent the following message to Bos Sav:

> From: 100000811666870 Patrick McKinnon
>
> Lost $1300 myself today out of just my plays. Was only able to take care of a couple people cuz there was no work to sell unless people wanted to drive me around let me run with money. I brought in $6500 in one night and usually never under $1-3k a night.  But my busiest times are from 10-5am
>
> 3/17/2024 10:53:41 PM(UTC+0)

Source Extraction: Legacy

11. In the above message, again MCKINNON's reference to "work" and "sell" lead me to believe he is referring to drug sales. McKinnon claimed he made $6500 in one night with average sales between $1000 to $3000 per night with his busiest times between 10 (pm) and 5 am.

12. While reviewing text messages in Target Device A, I located a text message conversation between 0214 and 207-205-7690 (7690). A contact was not saved for 7690. The text message conversation between 0214 and 7690 occurred between February 10, 2024 and March 17, 2024. On March 24, 2024, at 11:45:20 PM (UTC) 7690 sent 0214 the following message:

> From: +12072057690
> To: +17746360214 _$!<Other>!$_ (owner)
> Lost $1300 myself today out of just my plays. Was only able to take care of a couple people cuz there was no work to sell unless people wanted to drive me around let me run with money. I brought in $6500 in one night and usually never under $1-3k a night. But my busiest times are from 10-5am
>
> Participant              Delivered     Read      Played
> +17746360214 _$!<Other>!$_
>
> 3/17/2024 11:45:20 PM(UTC+0)
>
> Source Extraction: Legacy

13. The above text message is the exact same message that MCKINNON sent to NEVES (Bos Sav) on Facebook Messenger approximately 52 minutes earlier. This leads me to believe 7690 was being utilized by MCKINNON. The following text messages were found on Target Device A between 7690 (McKinnon) and 0214 (NEVES):



> From: +12072057690
> To: +17746360214 _$!<Other>!$_ (owner)
> Did he get that bread to you?
>
> Participant           Delivered   Read        Played
> +17746360214          2/11/2024
> _$!<Other>!$_         9:52:07
>                       PM(UTC+0)
>
> Status: Read
>                              2/11/2024 9:52:02 PM(UTC+0)
>
> Source Extraction: Legacy



From: +17746360214 _$!<Other>!$_ (owner)
To: +12072057690
No?
Status: Sent
2/11/2024 9:52:14 PM(UTC+0)

From: +12072057690
To: +17746360214 _$!<Other>!$_ (owner)
I'm calling him now and making him figure something out because there's no excuse that it's not taken care of
Status: Read
2/11/2024 9:53:07 PM(UTC+0)



From: +17746360214 _$!<Other>!$_ (owner)
To: +12072057690
Say less
Status: Sent
2/11/2024 9:53:20 PM(UTC+0)

From: +12072057690
To: +17746360214 _$!<Other>!$_ (owner)
I really need that other g bro whether I have to come get it or whatever but most of the bread wasn't mine and I had to pay dude out of my pocket
Status: Read
2/12/2024 9:49:49 PM(UTC+0)





14. The above text messages further bolster my belief that MCKINNON and NEVES were involved in drug sales together and it appears as though NEVES was supplying MCKINNON with drugs during this timeframe. I am familiar with several of MCKINNON's code words which have another meaning. The word "bread" referenes money and a "ball" is a specific quantintiy of drugs equal to one-eighth of an ounce or 3.5 grams. Both of those terms ("bread" and "ball") are common code words.

15. Utilizing a law enforcement website I determined the service provider for 7690 was T-Mobile. Subscriber records obtained from T-Mobile did not identify the subscriber leading me to believe the service is pre-paid (i.e. TracFone). Call detail records (CDR) showed 7690 had a total of 85 contacts with NEVES (774-636-0214) between January 21, 2024 and March 22, 2024. CDRs showed 7690 had a total of 165 contacts with ESTRADA (207-730-2993) between January 9, 2024 and March 26, 2024.

CDRs showed 7690 had a total of 233 contacts with ABRANTE (508-972-3282) between January 10, 2024 and February 8, 2024. Of the contacts listed above, ABRANTE was in MCKINNON's top five contacts.

16. A criminal history query for MCKINNON identified him as a wanted person. A limited extradition warrant was entered on February 21, 2024, for Failure to Appear – Aggravated Trafficking of Scheduled Drugs Class A, by the Sanford (Maine) Police Department.

17. There is probable cause to believe that MCKINNON committed the offense of distribution or possession with intent to distribute controlled substances in violation of 21 U.S.C. § 841(a)(1) and attempt and conspiracy in violation of 21 U.S.C. § 846. There is probable cause to search the person described in Attachment A for evidence of these crimes as described in Attachment B.

## TECHNICAL TERMS

18. Based on my training and experience, I use the following technical terms to convey the following meanings:

   a. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers

9

in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic

      data and may offer additional features such as a calendar, contact list, clock, or games.

d. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e. PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can

11

    store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

  f. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

  19. Based on my training, experience, and research, I believe that electronic devices have capabilities that allow them to serve as wireless telephones, digital cameras, portable media players, GPS navigation devices, and PDAs. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

  20. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, websites and other content that have been viewed via the Internet are typically stored for some period of time on the accessing device. This information can sometimes be recovered with forensics tools.

  21. Forensic evidence. As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that

establishes how the devices were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence might be on the devices because:

   a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

   b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

   c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

   d. The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

22. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of devices consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the devices to human inspection in order to determine whether it is evidence described by the warrant.

## CONCLUSION

23. I submit that this affidavit supports probable cause for a search warrant and there is probable cause to believe that evidence and instrumentalities of these crimes, as described in Attachment B, are contained on the person described in Attachment A.

Respectfully submitted,

_____
Jonathan Duquette
Task Force Officer
Federal Bureau of Investigation

Sworn to telephonically and signed electronically in accordance with the requirements of Rule 4.1 of the Federal Rules of Criminal Procedures

Date: Apr 19 2024

City and state: Portland, Maine

_____
*Judge's signature*

Karen Frink Wolf, U.S. Magistrate Judge
*Printed name and title*